HANCOCK, ADMINISTRATOR, APPELLANT, VS. TUCKER, AD-
MINISTRATOR, APPELLEE.

1. The rule that, on discovery of a fraud in a contract, the defendant should abandon and avoid claiming benefit by it; and, in case of a sale of goods, on discovery of unsoundness, that a return should be made by the vendee, is undoubted and indisputable, but not applicable to cases of sale of property of no value and when the subject purchased is not rightly an article of sale or of merchandize.

2. A new trial will not be granted, in case of conflicting testimony, when the weight of the evidence agrees with the verdict.

This case was decided at Tampa.

Appeal from the Circuit Court of Hillsborough county.

The opinion of the Court contains a statement of the facts in the case, to which reference is made.

*Magbee* and *Hart* for appellant.

*Gettis & Mitchell* for appellee.

BALTZELL, C. J., delivered the opinion of the Court.

This is a suit instituted upon two promissory notes given for the purchase of a negro man slave. The defence was,

1st. That Hancock, who made the purchase, was induced to enter into and make the said promises through and by means of the fraud, covin and misrepresentation of the said Tucker and others in collusion with him.

2d. That the notes were given for a negro man named Gadsden, and that, at the time of the sale, the vendor

fraudulently represented to the vendee that the said Gadsden was an able-bodied man, when, in fact, the said negro was then unsound, having a disease called dropsy, and was of *no value.*

The plaintiff replied, admitting the notes to have been given for Gadsden, but denied that Tucker represented to Hancock that Gadsden was an able-bodied man, or that he represented him sound, and avers that Hancock knew as much about the soundness of the negro as Tucker did, and that there was no objection to the unsoundness until defendant was pressed for payment of the notes.

The jury found for defendant under instructions given, and the plaintiff has appealed to this Court, alleging error in refusing to give instructions asked by plaintiff, in the admission and exclusion of questions proposed to witnesses and in not granting a motion for a new trial.

The evidence in the case was substantially as follows :

Tucker bought the negro from George Stafford; had him four or five days before he sold him to Hancock. Stafford sold the boy Gadsden to Tucker in the fall of the year, (September,) for $725.

Hearn, a witness for defence, swears that he resided in Hernando county, 4 or 5 miles from George Stafford's residence; was at Stafford's house on several occasions, and the negro was sick every time he was there; appeared to be diseased and was swelling very much; saw Stafford prick him on the back of his head and water proceeded from him; his hands and all his body were puffed up; the water appeared to be clear; he was sick and unable to do work for some time, about a month or more, in the fall of 1853; appeared to be restless; had to be propped up and made a good deal of fuss; Stafford resided 10 or 12 miles from Tucker's place; never saw the negro at work at Staf-

ford's after his sickness; saw him stirring about the yard; saw him after his sickness walking about the yard.

Dr. Todd, a practising physician, says he prescribed for a sick negro of Stafford's for dropsy some years since; it was during the year of the yellow fever, but before the fever occurred—in the fall and winter of 1853; he prescribed for him, but did not visit him; did not see him; can't say he ever saw him or not; the negro could not freely lay down from shortness of breath; Tucker and witness were friendly; did not tell Stafford he would injure Tucker if he could; told nobody so; was friendly with Tucker to the time of his death.

John Gallagher first saw Gadsden in 1845; whether in '53 or '54 can't say; knew him in 1844; rode up to Hancock's place and saw him leaning against a tree, with his arms between his head and the tree, 15 or 20 steps from witness; don't know whether he was swollen at the time; he was in a bad condition; could hardly talk; looked sick; his eyes were sunken as if in the gasp of death; he could hardly speak; Mr. Hancock owned the negro driving the cart to Tampa.

Dr. Branch, a practising physician, having heard the testimony of Hearn and others, says that the boy had dropsy—general dropsy. It arises from many organic diseases, which may be of very long standing, and, in his opinion, this was one of that kind. It may be temporarily removed, if of that kind, and, if the cause be not removed, it is death to return, which did happen in this case, according to the evidence which he heard. The disease had arrived at a very critical stage when the negro was in Stafford's possession, and he must have died if relief had not been given. The dropsy can be removed for a short time and the cause still remain in the system. It may be temporarily removed and the cause continued. The negro, in

his situation, was not an able-bodied man, provided the cause be from an organic derangement or disease. It was his opinion, from the testimony, the dropsy was occasioned by an aggrieved disease. He could conceive no other cause, from the description given. Swelling might be produced by the combined influence of cold and mercury, but the attendant symptoms of breathing, restlessness, as shown by the testimony in this case, could not be present. In case of mercury and cold producing a swelling of the body with asthma, he would have difficulty of breathing, restlessness in a recumbent or any other position. His opinion is, that the negro had general dropsy. If of eleven years standing, was incurable.

John Gallagher recalled: Says he thinks it was in the fall of 1845 he was first acquainted with the boy; he was sick that fall; I saw him in a very swollen condition; he appeared to me to be swollen all over; can't say whether he had a difficulty in breathing; did not examine him at that time; the boy was able to go about, not to work, then; this continued between 11 and 12 months after I saw him; the negro was in possession of Mr. Frierson at that time, Taylor Frierson, of Alachua county, in this State; I saw him at Locklosa Creek; I saw him on the plantation· after he was sick, but not there after he was sick; Peter Platt was present when Gadsden was sold by Tucker to Hancock; Mr. Tucker proposed to sell to me; asked why he didn't buy; think he was worth the price, and why he thought so; said he judged the boy by the looks of him; he heard the conversation between Tucker and Hancock; Tucker said he was a strong able-bodied boy and had split 250 or 300 rails a day, and he could do it again, just give him enough to eat.

Silas McLelland saw the boy in possession of Hancock; when first seen, he was walking about the yard, making a

little noise, appearing to be sick; a short time afterwards was at Hancock's again; the boy appeared to be very much swollen and in a good deal of pain; about three weeks between time of first seeing him; was about Mr. Hancock's frequently in the fall, as well as he recollects.

Mr. Sparkman says: In the spring of 1854 a cart was drove up to my house with a negro in it; Mr. Hancock's boy was driving the cart.

Mr. Roberts, a physician formerly practising in Alabama and Georgia, says he saw Mr. Hancock's boy driving a cart with a negro in it; a mere look indicated that the boy was dropsical. This physician has practiced in this State, but without charge.

This was the testimony on the part of plaintiff.

On part of defendant, William Stafford said that Hearn told him he would injure Tucker if he could; this was in 1852 or '53; I am friendly to Mr. Hearn; had no difficulty with him; people say that Mr. George Stafford is my uncle; Hearn is said to be my brother-in-law.

Mr. McCarty says: He knew the boy Gadsden, sold by him to George Stafford; he was not in possession of Taylor Frierson in '44 or '45 to my knowledge; William Stafford knew the boy Gadsden, owned by George Stafford; he had him in 1852; does not know who George Stafford sold him to; had him in 1853, to the best of his belief; witness worked with the boy in the spring and summer of 1853; didn't see any difference in his work and mine; he, witness, was an able-bodied man at that time; the boy done as much work as I did, or any other negroes I ever saw work; never saw him split rails; has lifted and rolled logs with him; he could lift as much as witness could; the negro was sick once; appeared very sick; was well as anybody else afterwards; George Stafford sold the negro to

24

William Tucker in September, 1853; he did the work of an able-bodied man all the spring and summer of 1853; was sick in the fall of 1852; gave him calomel, but can't say that he took cold; was sick for a month or six weeks in the fall of 1852; did the work of an able-bodied man, after he recovered from the sickness, up to the time I sold him; have seen him split rails; he could split 250 rails a day, and do it before night; I sold him because he would run away from me; Capt. Kendrick offered me what I gave for the negro, but the terms did not suit.

Dr. Kendrick, a practising physician, was present when Stafford sold the negro to Tucker, about 1st Sept., 1853; was witness to a bill of sale; Tucker asked Hancock $1,000 for the boy; from the time Tucker had the negro from Stafford 7 or 8 days elapsed till he sold him to Hancock; the sale of him (Tucker to Hancock) was 21st Sept., 1853; from Stafford to Tucker, between 10th and 15th September, 1853; I traveled with Tucker and the boy from Fort Dade to Hancock's, distance 30 or 35 miles; Tucker and myself went in a buggy, the boy on foot: took us a part of the day; the boy stood the journey remarkably well; didn't hear Tucker say one word about the health or unsoundness of the boy; Hancock tried him one day, or part of a day; was acquainted with the boy in the spring of 1853, and, so far as witness knows, he was an able-bodied man; is positive that the boy did not have dropsy, nor any symptoms of dropsy, at the time of the sale to Hancock. Cross-examined—Thinks Tucker owned the boy some 7 or 8 days.

James D. Green says, that in a short time after Hancock bought the negro he saw him splitting rails about six miles from Tampa, and saw him working in a field near Hancock's house.

Dr. Benton states, that Hancock applied to him for

medicine for his boy, sick with the dropsy, and witness told him he could not go to his house to attend said boy, and that in April, 1854, a boy came to his house with a negro in the cart, and that he was then dead; and he examined the corpse, and from that examination became of the opinion the boy died of the dropsy, but can't say that it was the boy Hancock bought of Tucker.

This was the testimony in the case from the record.

The instructions required the jury to ascertain whether there was a false representation of material importance in the sale of the negro, conducing to it and to the injury of defendant, or that there was fraud in the making it. In case of their finding either of them, then the further enquiry was whether there was a return of the property after discovery of such fraud or misrepresentation. If not, and he was kept by defendant, then plaintiff was entitled to its actual value, as established by the evidence. The jury having found for defendant, the fair and just conclusion from their verdict is that there was fraud or misrepresentation and that the negro was not of value. Nor do we think that he has right to complain of the instructions. They seem to be appropriate to the case, to embrace it in all its parts and as favorable to plaintiff as he could have asked or expected; for, laying out of view the more severe aspect of the case, that of fraud, and assuming that there was misrepresentation to the injury of defendant to some extent, on principles obvious to the most common mind, there should be an abatement of the price to this extent. A price paid through misrepresentation is not and should not be the true price to be adjudged by a Court. What, then, should and ought to be the true price? Most obviously the actual value, as established by proof divested of its misrepresentation. That is the value that has been fixed, estimated and allowed by the jury in the present

case. The testimony on the subject, it must be admitted, is varied and contradictory, just such as is properly referable to a jury of the vicinage, acquainted with the parties and the witnesses, to reconcile their statements, or, if this may not be done, to ascertain the truth by giving proper allowance and regard to that which is of worth and rejecting that entitled to no estimation. There is no reason, so far as we can see, to doubt or call in question the accuracy of their decision. The preponderance of the proof, in our opinion, is clearly on the side of defendant and with the verdict of the jury, and we cannot arrive at the conclusion that it was against the law or the evidence. Whilst such is the conviction of our own minds, the enquiry yet is as to the law of the case, and whether this ruling of it is supported by the authorities. The only difficulty arises from the fact that the property was not returned, but kept by the defendant after discovery of the defect, in reference to which the rule is: "On discovery of the fraud, the defendant ought to abandon the contract and avoid claiming any partial benefit from it, and in his plea ought to make an allegation to that effect, and that the defendant had notice thereof."—2 Sand. Pl. and Evidence, part 1st, pp. 61–'5, Am. ed'n.

"Where goods are discovered not to answer the order given for them, or to be unsound, the purchaser ought immediately to return them to the vendor, or give notice to take them back, and thereby rescind the contract, or he will be presumed to acquiesce in the quality of the goods." 2 Kent's Com., 480.

No doubt this is founded in the best sense and highest reason, conducing to the maintainance of contracts, their proper observance and due execution—not rightly should there be a deviation or departure by the Courts in the respect due to it. A man may be entitled, by his bargain, to

property of a peculiar kind, of a particular quality or figure, and, not obtaining these, he should, on discovery of the defect, at once and without delay make return. He may not keep the article and refuse the price; for, if returned, the vendor might sell to others having occasion for just such an article. But, suppose the property itself be of no use nor value, either to the vendor or vendee, and be not rightly an article of merchandize or of sale, as in the obvious case of decayed or diseased provisions, or other worthless property, the reason of the rule ceasing the rule itself ceases. A return here would seem not to be required by any rule of right, reason or legal exaction.

We regret that we have not time to pursue this subject through the various adjudications of the Courts, so as to extract from them such just and rightful conclusions as might be obtained after elaborate investigation. As it is, we neither have the time in which to make the examination, nor, if we had, have we the books to refer to. We think the adjudications of the English and American Courts will be found to support the view we have taken of the subject.—2 Greenleaf Evi., p. 136, No. 4, 6th ed'n, refering to Benton vs. Stewart; 3 Wendell, 236, Van Eppes vs. Harrison; 5th Hill, 64, Thornton vs. Wynn; 12 Wh., 183, Case vs. John; 10 Watts, 107, McAlister vs. Reab; 4th Wendell, 483; 8th Wendell, 109, Steel vs. Hall; 20th Wendell, 51; 3 Hill, 172; 1 Livy & Rauls, 477.

The decision of the Supreme Court of the United States in the well-considered case of Withers vs. Green, 9 Howard, 220, given in full in 8 Florida, 86, would seem in its reasoning and language to have a direct application to the subject before us. The Court say: "Turning to a class of cases founded on what has been denominated a failure of consideration, although involving bad faith, breach of warranty, false and deceitful warranties, false misrepresenta-

tion in the procuring of contracts, such as might in particular aspects extend to the entire recision of contracts, it will be seen that the Supreme Court of Alabama have, in the construction of their statute, ruled that a defence founded on either or on all of the facts here enumerated shall be admissible in mitigation of damages; and in allowing this mode of defence, which seems to fall more strictly within the import of the terms set-offs and discounts than objections aimed at the total abrogation of contracts can do, the Courts of Alabama have acted in accordance with those of other States in construing statutes similar to their own—consistently, too, with the principles of reason and justice adopted by modern tribunals when acting apart from statutory provisions," &c. "Upon authority, both in point of respectability and numbers, it is clearly provable that where fraud enters into the transaction, it is competent for the defendant, upon proof of it, to show a defect in the consideration in diminution of damages." Proceeding still further, the Court quotes the case of Kings vs. Boston, "where the plaintiff sold a horse for 12 guineas, three of which were paid and the property warranted sound. It was proved that the horse, at the time of the sale, was worth not so much as had been paid, and the Court non-suited plaintiff." As a conclusion on the whole subject, the Court say: "But, however, the rule laid down by the Courts in England should be under. stood. It has been repeatedly decided by learned and able Judges in our country, when acting, too, not in virtue of a statutory license or provision, but upon the principles of justice and convenience, and with the view of preventing litigation and expense, that where fraud has occurred in obtaining or in the performance of contracts, or where there has been a failure of consideration, total or partial, or a breach of warranty, fraudulent or otherwise,

all or any of these facts may be relied on in defence by a party when sued upon such contract, and that he shall not be driven to assert them, either for protection or as a ground for compensation in a cross action." In this case, suit was upon a note of hand of $3000, given for two fillies, represented sound and of high pedigree, and purchased for their blood and for the turf. The defence was unsoundness and falsehood as to the pedigree, without any return of them, but an excuse for the failure. In reference to this state of case, the Court say: "If the purchaser choose to retain the property and either to sue upon the warranty of pedigree and soundness or to defend himself upon the ground of difference between the true and pretended value of the property, he was bound neither to give immediate notice nor to tender a return of the property. He would be permitted to discount the difference between the real and simulated value."—9 Howard Sup. Court Repts., 220.

This would seem to be an authority expressly in point to the case before us; for, by the decision of the Court, the true value of the fillies was adjudicated, the measure of the plaintiff's rights, not the price induced by misrepresentation. Here the value, as found by the jury upon the true state of the case, has been fixed as the true sum. If they had allowed a hire or some small sum for the use, we should not have considered it objectionable. As it is, they must have been satisfied. The boy was of no value, and we see no cause to differ with them. We do not deem it necessary to discuss at any length the error assigned as to the refusal of the Court to give the instructions asked by plaintiff; this has been sufficiently treated in our views as to the instructions given. Nor do we think it proper to examine the objections to questions proposed to witnesses at almost every question asked or rejected by the Court. It would but extend the opinion to an extraordinary length

without any compensating benefit or advantage. There is no question of principle or matter of importance in any of them affecting the true merits of the case. The objection made to an unlicensed physician as a witness may be regarded rather as harmless and not conducing to any injurious result on the whole case.

We are of opinion that the judgment of the Circuit Court is right and should be affirmed.

DuPONT, J., dissenting.